## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEFFERY D. JAECKELS** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:21cv40-HSO-RHWR** |
| | § | |
| | § | |
| **GOLDEN NUGGET, LLC,** *et al.* | § | **DEFENDANTS** |

### MEMORANDUM OPINION AND ORDER GRANTING
### IN PART AND DENYING WITHOUT PREJUDICE IN PART
### DEFENDANTS' MOTION [41] FOR SUMMARY JUDGMENT, AND
### REMANDING CASE TO STATE COURT

BEFORE THE COURT is the Motion [41] for Summary Judgment filed by Defendants Golden Nugget, LLC ("Golden Nugget"); Riverboat Corporation of Mississippi, doing business as Golden Nugget Biloxi Hotel and Casino ("RCOM"); and James Snuggs, Individually ("Mr. Snuggs," "Jim," or "Chef Jim").

After consideration of the Motion, the record, and relevant legal authority, the Court finds that the Motion [41] for Summary Judgment should be granted in part as to Plaintiff Jeffery D. Jaeckels' claims under the Americans with Disabilities Act and denied without prejudice in part as to his state-law claims.   Plaintiff Jeffery D. Jaeckels' claims under the Americans with Disabilities Act will be dismissed with prejudice.   The Court declines to exercise supplemental jurisdiction over the remaining state-law claims, and these claims will be remanded to state court.

I.   BACKGROUND

A.   Factual background

1.   Plaintiff's employment

This dispute arises out of Plaintiff Jeffery D. Jaeckels' ("Plaintiff," "Mr. Jaeckels," or "Jeff")[1] employment as a utility-dishwasher at the Golden Nugget Casino in Biloxi, Mississippi.   *See* Compl. [1-1] at 1, 4.   Mr. Jaeckels began working with Golden Nugget Casino's predecessor, Isle of Capri Casino, on December 1, 1995, and continued working in the same position with the Golden Nugget Casino until he was terminated on August 5, 2019.   *See id.* at 4; Ex. [41-16] at 1.

The Complaint alleges that Mr. Jaeckels has suffered from significant mental disabilities since birth, and his mother, Cecelia Baker ("Ms. Baker"), is his caretaker.   *See* Compl. [1-1] at 4-5.   Ms. Baker handled all communication with employees at the Golden Nugget Casino regarding Mr. Jaeckels' paid time off, scheduling, performance, or any other issues. *See id.*   She has described Mr. Jaeckels as "mentally impaired," Baker Dep. [45-2] at 89, but he was awarded a high school diploma in 1992, *see* Ex. [41-2] at 1.

At some point in late 2018, a former employee of the casino, Linda Quarrels ("Ms. Quarrels"), approached Ms. Baker and informed her that Mr. Jaeckels "was being mistreated in the kitchen."   Baker Dep. [45-2] at 14.   According to Ms.

---

[1] Plaintiff's first name is spelled "Jeffery" in the Complaint [1-1] and on the docket, but in opposition to summary judgment, Plaintiff refers to himself as "Jeffry."   Mem. [46] at 1. The Court will employ the spelling used in the Complaint and on the docket.

Baker's deposition testimony, Ms. Quarrels reported that Mr. Jaeckels was not being permitted to enter an area called "the bakery" because "he asked the same question too many times," *id.*, even though the other dishwashers entered the area "taking dishes in or getting dishes or whatever," *id.* at 21.   Individuals also "called him names" and "just in general made fun of him," and they "[m]ade him do pots and pans more often than every- -- anybody else in the -- in the dishwashers."   *Id.* at 14.[2]

Mr. Jaeckels has testified that only "Jim and John" "called [him] names," Jaeckels Dep. [45-6] at 13, and that this had occurred in 2019, *see id.* at 15. According to Mr. Jaeckels, Defendant James ("Jim") Snuggs called him "[p]ig," but he could not remember any other names.   *Id.* at 13.   When asked if he was called names "a lot or a little," Mr. Jaeckels responded "[l]ittle," and he never reported it to the casino's Human Resources Director Stephanie Utesch ("Ms. Utesch" or "Stephanie"), only to his mother.   *Id.*

On October 12, 2018, Ms. Baker sent an e-mail to Ms. Utesch concerning her meeting with Ms. Quarrels.   *See id.* at 26.   Ms. Utesch responded that she would be out of the office the following week but would pass the message on to the Employee Relations Manager Dina Stanley ("Ms. Stanley").   *See id.*; Ex. [41-8] at 1. Mr. Snuggs testified that he and Ms. Utesch later spoke about the issue, and he

---

[2] Defendant James Snuggs, the executive chef at the Golden Nugget Casino, denied the allegation that Mr. Jaeckels was required to wash pots and pans more frequently than other dishwashers.   Snuggs Dep. [41-6] at 7, 31.   Instead, he stated that it was "the least favorite of anybody," and the dishwashers would rotate through the various stations and "basically about every third day or so or fourth day," they would have to work in a particular spot.   *Id.* at 31-32.

denied that anyone at the casino, including himself, had called Mr. Jaeckels names.
*See* Snuggs Dep. [24] at 24-26.   According to Mr. Snuggs, he always referred to Mr.
Jaeckels as "Jeff or Jeffery."   *Id.* at 26.   "A day or so" after his meeting with Ms.
Utesch, Mr. Snuggs participated in a telephone conference with Ms. Baker and
others.   *See id.* at 26.   Ms. Baker testified that the telephone conference involved
herself, Ms. Stanley, Mr. Snuggs, and Chef Tremayne Davis ("Mr. Davis" or
"Tremayne").   *See* Baker Dep. [45-2] at 27-28, 30-31.   Ms. Baker

> made them aware of the things that Linda had told us, and they assured
> me over and over that nothing like that had happened, that Linda was a
> -- I believe they called her a disgruntled employee, and that nobody had
> ever said anything to Jeff inappropriately or treated him in any way
> other than any -- the other employees in the kitchen.

*Id.* at 31.

Ms. Stanley described the conversation with Ms. Baker in an e-mail to the
Golden Nugget Casino's General Manager, Chett Harrison ("Mr. Harrison"), and its
Assistant General Manager, John L. Guy ("Mr. Guy"), as follows:

> Dan, Chef Jim and I spoke with Ms. Baker, [sic] I had advised her that
> the individuals that she mentioned are no longer employed at the GN
> and in some [sic] have not been here for quite some time.   I assured her
> that her son had not been mistreated, and the rumors she heard are just
> that rumors from former, disgruntled employees.   It ended well with
> her understanding that Jeff is not being harassed in any way and we
> have a zero tolerance for harassment throughout the whole company.

Ex. [45-17] at 1.

Ms. Utesch testified that after the telephone conversation with Ms. Baker,
she investigated the complaint.   *See* Utesch Dep. [45-5] at 19-20.   One allegation
made by Ms. Baker was that someone had referred to Mr. Jaeckels as "Jethro," but
no one could corroborate this allegation.   *See id.* at 20.

According to Ms. Baker, after the telephone conference, she and her husband

> decided that if something had been going on, and now they know that
> we know they know, that it wouldn't be going on anymore, and that
> everything -- he would -- he would be back to his regular activities and
> everything would be fine, that nothing would ever be said to him again.

Baker Dep. [45-2] at 32.

### 2.   Mr. Jaeckels' performance issues

Ms. Utesch also testified that beginning in 2015 there were issues concerning

Mr. Jaeckels not liking his job.   *See* Utesch Dep. [45-5] at 14.   On one occasion, the

previous executive chef, Ryan Hayes ("Mr. Hayes"), informed Ms. Utesch that

"Jeffery's not wanting to work today.   He's just shaking his head.   He doesn't want

to do it.   He doesn't feel like working today, can you help us. [sic]" *Id*.   Several

times, Ms. Utesch would speak with Mr. Jaeckels about working and "try to cheer

him up as much as possible."   *Id*. at 14-15.

While there were some poor performance issues from the beginning of Mr.

Jaeckels' employment, Ms. Utesch testified that "[it] got worse at the end, to my

knowledge, because he just didn't want to perform those job duties anymore."   *Id*.

at 15.   Ms. Utesch agreed that this problem became much worse in 2019 and stated

that "upon refusing to do his job duties toward the end, it became a health violation,

and we were going to make people sick because the dishes were not cleaned

thoroughly, nor were they dried."   *Id*. at 15-16.   There were also several incidents

where Mr. Jaeckels was insubordinate.   *See id*. at 16.

Defendants have submitted the annual Hourly Employee Performance

Review for Mr. Jaeckels dated December 7, 2018, which graded each performance

category from 1 ("Substandard performance") to 5 ("Role model").   *See* Ex. [41-10] at 1.   Mr. Jaeckels received all 2s and 3s.   *See id.* at 1-2.   A grade of 2 represents an "[i]nconsistent performance, improvement is required with a specific plan to eliminate inconsistencies," while a 3 means that the person is "[f]ully trained and experienced, meets all job requirement [sic] and achieves expected results."   *Id.* at 1.   Notably, the review stated that Mr. Jaeckels "is unwilling to complete certain tasks"; "[a]t times, [he] is insubordinate" and "unwilling" to do his job; "is often unwilling to assist his coworkers"; and "needs to make sure he is completing the task completely and correctly when they [sic] are asssigned [sic] to him."   *Id.*   Mr. Jaeckels' total point value on the review was 22; a point value under 27 is deemed "unacceptable" because "performance does not meet company standards and could lead to disciplinary action up to and including termination."   *Id.* at 2.

Mr. Snuggs testified that he began having problems with Mr. Jaeckels in 2019 when he did not want to perform certain tasks or work in certain areas.   *See* Snuggs Dep. [45-3] at 19.   Mr. Jaeckels' direct supervisors began communicating those problems to Mr. Snuggs, Mr. Davis, and Ms. Utesch.   *See id.* at 21-22.   Some of the issues involved "food safety handling issues," such as plates and dishes being put away when they were not properly cleaned.   *Id.* at 23.   Mr. Snuggs testified that there were occasions when Mr. Jaeckels simply refused to perform the work assigned or stated that he did not want to do it.   *See id.* at 32.   Although "it wasn't typical to involve the director or VP of HR in matters of a frontline employee," Mr. Snuggs stated that he brought these issues to Ms. Utesch's attention "[j]ust so that [Mr. Jaeckels] was clear on what was being asked of him and the directions he was

given," and because Ms. Utesch "had contact with his mother in regards to . . . help with Jeff." *Id.* at 33-34.

At first, complaints about his performance were conveyed to Mr. Jaeckels verbally. *See id.* at 23. Ms. Utesch would explain the performance forms to Mr. Jaeckels so that he understood, and he would sign them. *See id.* Ms. Utesch also had verbal exchanges with Mr. Jaeckels or Ms. Baker, and she would document the conversations in an employee relations log. *See* Utesch Dep. [45-5] at 19.

Eventually, Mr. Jaeckels received several writeups in 2019 preceding his termination. *See id.* at 22-32. The first was a Performance Document Form dated May 17 or 20, 2019 ("PDF-1"). *See id.* at 32; Ex. [45-9] at 1. The purpose of the PDF-1 was to document verbal counseling based upon job performance. *See* Ex. [45-9] at 1. It stated that

> [o]n Friday[,] May 17th[,] 2019[,] around 12 pm Jeff was asked to move to the pot sink by stewarding lead Dejuante Bullock because the person working the pot sink went home sick. Jeff said "no" and was unwilling to move from where he was to where he was needed. Jeff needs to be flexible in the stations he works when business needs require. Further actions like this will lead to more progressive discipline up to and including termination.

*Id.*

Another writeup dated June 27, 2019 ("PDF-2"), was a written warning for failure to complete job duties. *See* Utesch Dep. [45-5] at 31; Ex. [45-10] at 1. PDF-2 stated:

> [o]n Wednesday[,] June 26th[,] 2019[,] around 3 pm Jeff was catching on the dish machine. The dishes he was putting on the cart to put away were still dirty and not dry. Jeff has been talk to many times about the steps of dishwashing[:] 1. wash 2. rinse 3. sanitize 4. air dry . . . . . . . . . Not following these steps could lead to making someone sick[.] In the

future Jeff should follow these 4 steps in the warewashing process. Failure to do this will result in further disciplinary action up to and including termination.

Ex. [45-10] at 1.   Mr. Jaeckels identified his signature on PDF-2, but he did not recall anyone speaking with him about it.   *See* Jaeckels Dep. [45-6] at 34-35.

Mr. Jaeckels also received a writeup on July 17, 2019, concerning a trash compactor ("PDF-3").   *See* Utesch Dep. [45-5] at 28; Ex. [45-11] at 1.   Human resources received a complaint from the receiving manager that Mr. Jaeckels had placed boxes in the compactor without breaking them down, which "stops the entire operation and backs up."   Utesch Dep. [45-5] at 27.   PDF-3 was a "FINAL Warning" and stated that:

> [o]n Wednesday 7/17/19 Jeff was on trash and floors.   Part of this area is to break down all the boxes and put them in the compactor.   Jeff did not break down or take the plastic out of them.   The plastic in them causes the to [sic] reject the bail.   Jeff was asked if he knew he was suppose [sic] to break the boxes down which he replied yes.   He was then asked why he did not do that, to which he just shrugged his shoulders.   When on trash and floors Jeff needs to break the boxes down and take the plastic out of them.

Ex. [45-11] at 1.   During Mr. Jaeckels' deposition, he acknowledged that he had to break down the boxes first and flatten them out in order to put them inside the "box crusher," but he testified that he always did that.   *See* Jaeckels Dep. [45-6] at 24. Mr. Jaeckels again identified his signature on the form, but he did not recall receiving it.   *See id.* at 36.

Mr. Jaeckels received a final writeup on August 5, 2019 ("PDF-4"), which was "another health code violation where he refused to clean" pans from the bakery, which can collect mold that can get into the food.   Utesch Dep. [45-5] at 36; *see also*

Ex. [41-16] at 1.    According to a statement from Mr. Snuggs regarding this

incident, Mr. Jaeckels did not clean the "speed rack" as he was supposed to, and

when Mr. Davis discovered this, he took it back to Mr. Jaeckels for cleaning.    Ex.

[41-16] at 5.    Mr. Jaeckels returned the rack again as if it were clean, but it was

not.    *See id.*    After asking Mr. Jaeckels to clean the rack three times, Mr. Davis

called Ms. Stanley from human resources, who contacted Mr. Snuggs.    *See id.*

When Mr. Snuggs and Ms. Stanley asked him why he did not clean the rack, Mr.

Jaeckels shrugged his shoulders, and when they asked if it was because he did not

want to do it, he responded "yea."    *Id.*    Mr. Jaeckels acknowledged in his

deposition that Mr. Snuggs asked him to clean the speed rack and wipe it down, but

that he did not do so because it was hard to do and he did not want to perform the

task. *See* Jaeckels Dep. [45-6] at 38-40.[3]    According to Ms. Utesch, "that's when we

decided to end his employment."    Utesch Dep. [45-5] at 37.    PDF-4 stated that Mr.

Jaeckels was being terminated for poor job performance and insubordination.    Ex.

[41-16] at 1.

Ms. Utesch testified that, with progressive discipline, the decision to

terminate an employee is a "collective" one.    *See* Utesch Dep. [45-5] at 17.    On

August 5, 2019, she and Mr. Guy collectively made the decision to terminate Mr.

Jaeckels because the two-writeups leading up to the separation constituted health

violations.    *See id.* at 17-18.

At Mr. Jaeckels' request, Ms. Utesch did not notify Ms. Baker of the final

---

[3] Mr. Jaeckels sometimes referred to the rack as a "[s]eeping rack," but it appears from the
record that the proper term was "speed rack."

9

writeup.  *See id*. at 24-25.   When Mr. Jaeckels informed his mother that he had been terminated, Ms. Baker contacted Ms. Utesch, who informed her that Mr. Jaeckels was terminated for a series of three counseling notices, *see* Baker Dep. [45-2] at 53, and she showed Ms. Baker the writeups, *see* Utesch Dep. [45-5] at 42. During her deposition, Ms. Baker testified that she had "no idea" whether or not the last three counseling notices from June, July, and August 2019 were improperly issued to Mr. Jaeckels, *see* Baker Dep. [45-2] at 50, nor was she aware of any other Golden Nugget Casino employees who had violated the same policies but were not disciplined, *see id*. at 54.

B.   Procedural history

Mr. Jaeckels filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the "Golden Nugget Casino Hotel," claiming that he was harassed and discriminated against in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq. (the "ADA").   *See* Charge [27-1] at 1.   The EEOC issued its Notice of Suit Rights [27-2] on August 13, 2020.

On November 12, 2020, Mr. Jaeckels filed suit in the Circuit Court of Harrison County, Mississippi, Second Judicial District, against Golden Nugget; RCOM; Mr. Snuggs, individually; and John or Jane Does 1-10.   *See* Compl. [1-1] at 1.   The Complaint advances claims against Defendants for violations of the ADA (Count I); breach of contract, wrongful termination, and breach of the duties of good faith and fair dealing (Count II); tortious interference with business/contractual relations (Count III); and negligent infliction of emotional distress (Count IV).   *See*

*id.* at 7-13.

Invoking federal question jurisdiction, Defendants removed the case to this Court, *see* Notice of Removal [1] at 1-2, and Golden Nugget filed a Motion [27] for Partial Summary Judgment, arguing that Mr. Jaeckels' claims against it should be dismissed because it was never his "employer" under the ADA, and because Mr. Jaeckels never filed an EEOC charge against it, *see* Mem. [28] at 2-5.   The Court granted the Motion [27] in part as to the ADA claims against Golden Nugget, but because the Motion [27] had not specifically addressed any of Mr. Jaeckels' state-law claims, it denied the Motion [27] without prejudice to the extent it sought summary judgment on those claims.   *See* Order [37] at 8.   Plaintiff's state-law claims against RCOM, Golden Nugget, and Mr. Snuggs, and his ADA against RCOM, remain for resolution,[4] and Defendants now seek summary judgment as to all remaining claims.   *See* Mot. [41].

## II.   DISCUSSION

### A.   Summary judgment standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "There is no genuine issue for trial when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"   *McMichael*

---

[4] The Complaint does not appear to assert an ADA claim against Mr. Snuggs.   *See* Compl. [1-1] at 8 (alleging that Golden Nugget and RCOM "are covered employers to which the ADA applies").

*v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019)

(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)).   In considering a motion for summary judgment, the evidence is viewed in

the light most favorable to the non-moving party, with all reasonable inferences

drawn in his favor.   *See id.*; *see also United States Sec. & Exch. Comm'n v. Kahlon*,

873 F.3d 500, 504 (5th Cir. 2017).   A court may not make credibility determinations

or weigh the evidence.   *See Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

B.   Plaintiff's ADA claims

The ADA provides that "[n]o covered entity shall discriminate against a

qualified individual on the basis of disability in regard to job application procedures,

the hiring, advancement, or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment."   42 U.S.C.

§ 12112(a).   Such discrimination includes

> not making reasonable accommodations to the known physical or
> mental limitations of an otherwise qualified individual with a disability
> who is an applicant or employee, unless such covered entity can
> demonstrate that the accommodation would impose an undue hardship
> on the operation of the business of such covered entity . . . .

*Id.* § 12112(b)(5)(A).

The Complaint alleges that Defendants discriminated against Mr. Jaeckels,

failed to provide him reasonable accommodation, and harassed him because of his

mental disabilities.[5]   *See* Compl. [1-1] at 8-9.

---

[5] Plaintiff did not assert any ADA retaliation claim in the Complaint [1-1], but in opposition
to summary judgment, he seems to allude to such a claim when discussing his ADA
discrimination claim.   *See* Mem. [46] at 13 ("Ms. Baker complained to the management of
the casino about the conduct of the employees.   Approximately 7 months later, the Golden

1.   <u>ADA failure-to-accommodate claim</u>

    a.   Relevant legal authority

To prevail on a failure-to-accommodate claim, a plaintiff must prove that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. Louisiana, Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (quotations omitted); *see also Jones v. Lubbock Cnty. Hosp. Dist.*, 834 F. App'x 923, 926 (5th Cir. 2020).   The ADA defines a "reasonable accommodation" as including:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

"The ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so."   *Thompson v.*

---

Nugget Jeffry's [sic] work takes a down turn [sic] and he gets written up, instead of contacting Ms. Baker.").   Plaintiff has not advanced an ADA retaliation claim, and as Defendants point out in their Rebuttal, Plaintiff failed to exhaust any retaliation claim. *See* Rebuttal [48] at 6 (citing EEOC Charge [48-2]); *see also, e.g., Jennings v. Towers Watson*, 11 F.4th 335, 342 (5th Cir. 2021).   Even affording its substance the most liberal construction, no EEOC investigation concerning an ADA retaliation claim could be expected to grow out of Plaintiff's EEOC Charge.   *See Jennings*, 11 F.4th at 342; EEOC Charge [48-2].

*Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quotation omitted). The Fifth Circuit has defined essential functions as "those that bear more than a marginal relationship to the job at issue." *Id.* (quotation omitted). To determine whether a function is essential, a court must look to "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, and the consequences of not requiring the employee to perform the function." *Id.* (quotation omitted). The greatest weight is afforded the employer's judgment factor, but a court "must evaluate the employer's words alongside its policies and practices." *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 325 (5th Cir. 2021) (quotation omitted).

"An employee who needs an accommodation has the responsibility of informing his employer." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (quotation omitted).

> The employee must explain that the adjustment in working conditions or duties [he] is seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase "reasonable accommodation." Plain English will suffice.

*E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).

"When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *Thompson*, 2 F.4th at 468-69. This process requires "communication and good-faith exploration." *Chevron Phillips Chem. Co.,* 570 F.3d at 621. An employer's "unwillingness to engage in a good faith interactive process is a violation of the ADA." *Thompson*, 2 F.4th at 69 (quotations omitted).

14

b.   The parties' arguments

RCOM argues that Mr. Jaeckels' failure-to-accommodate claim fails because "neither Plaintiff nor Ms. Baker ever asked Defendants to provide an accommodation to Plaintiff so that he could perform the essential functions of his job." Mem. [42] at 14.   According to RCOM, "[a]lthough Ms. Utesch had frequently corresponded with or spoken with Ms. Baker regarding Plaintiff . . . , the Company was under no obligation to inform Ms. Baker each time that Plaintiff acted in an insubordinate manner or failed to perform his job duties," or to inform her of any performance documents that were issued to him. *Id.* at 15.   RCOM points out that neither Ms. Baker nor her husband has a guardianship or conservatorship over Mr. Jaeckels. *See id.* (citing Baker Dep. [41-9] at 4).   RCOM states that giving Ms. Baker an opportunity to counsel Plaintiff prior to him being issued performance documents for his work deficiencies would have been unreasonable "because it would not be designed to assist Plaintiff in the performance of the essential functions of his job duties," and would instead "effectively insulate Plaintiff from the rules of the workplace and substitute Ms. Baker's at-home counseling of Plaintiff for legitimate counseling by Plaintiff's supervisors after Plaintiff engaged in insubordinate conduct." *Id.* at 15.

Mr. Jaeckels responds that he had an open and obvious disability that was known to RCOM, and that RCOM had someone read the reprimand documents to him because he could not read or understand them. *See* Mem. [46] at 14-15.   Mr. Jaeckels asserts that his intellectual disability precluded him from understanding and articulating his need for an accommodation, and that prior to June 2019 RCOM

had utilized the accommodation of communicating with Ms. Baker.   *See id.* at 16.
Although the word "accommodate" was never used, Ms. Baker had requested that
RCOM communicate all employment-related actions and notifications with her.
*See id.* at 18.   Mr. Jaeckels directs the Court's attention to an authorization dated
October 3, 2016, whereby he gave his "permission for any and all information
regarding [his] employment at the Golden Nugget to be shared with [his] parents,
Cecelia and Wayne Baker, and that they have [his] authorization to act for me in
any and all circumstances."   Ex. [41-5] at 1.

    c.   Analysis

    The record is undisputed that neither Mr. Jaeckels nor Ms. Baker requested
an accommodation for any limitations that Mr. Jaeckels may have had in order to
perform essential functions of his dishwashing position.   *See, e.g.,* Utesch Dep. [41-
7] at 43 (testifying that neither Mr. Jaeckels nor Ms. Baker had ever requested of
her any sort of accommodation to allow Mr. Jaeckels to perform his job as a
dishwasher); Baker Dep. [41-9] at 34 (testifying that she did not ask anyone at the
Golden Nugget Casino to provide any sort of accommodation to Mr. Jaeckels for him
to be able to perform his job).   Nor did Ms. Baker believe such an accommodation
was necessary.   *See, e.g.,* Ex. [41-17] at 1 (EEOC Pre-Determination Interview form
stating, "Ms. Baker stated her son does not need an accommodation."); Baker Dep.
[41-9] at 38 (testifying that she told the EEOC that her son does not need an
accommodation, that Mr. Jaeckels was "[a]bsolutely" able to perform the functions
of his job at the casino, and that there was no accommodation that she wanted
RCOM to make).   Because Mr. Jaeckels did not request an accommodation within

the meaning of the ADA, RCOM's duty to engage in interactive discussions with him was never triggered.   *See Thompson*, 2 F.4th at 468-69; *Delaval*, 824 F.3d at 481.

In support of this claim, Mr. Jaeckels cites the cessation of the purported accommodation he had previously been provided, whereby someone from human resources would speak with Ms. Baker after the fact concerning Mr. Jaeckels' performance issues.   *See, e.g.,* Mem. [46] at 16.   However, to accept such an argument, the Court would first have to find that the action RCOM had previously taken in communicating with Ms. Baker constituted an accommodation that was required by the ADA.   *See Feist*, 730 F.3d at 452 (stating that an element of the failure-to-accommodate claim is that the employer failed to make reasonable accommodations for known limitations); *see also, e.g., D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (explaining that, "even if an employer has voluntarily provided accommodations to the employee historically, that employer is not obligated to continue providing them and can discontinue such when they exceed what is legally required under the ADA").

This is not a situation where Mr. Jaeckels required "qualified readers or interpreters, and other similar accommodations" to perform the essential functions of his utility-dishwasher position.   42 U.S.C. § 12111(9).   From the record there appears to be no dispute that, even without an accommodation, Mr. Jaeckels could perform those functions, though he sometimes chose not to do so.   *See, e.g.,* Ex. [41-4] at 12 (Mr. Jaeckels testifying that he did not clean dishes as Mr. Snuggs had requested because he "[d]on't [sic] want to"); Ex. [41-16] at 5 (statement from Mr.

Snuggs stating that Mr. Jaeckels responded affirmatively when asked if he did not clean the speed rack because he did not want to).   Ms. Baker even informed the EEOC investigator that Mr. Jaeckels "does not need an accommodation."   Ex. [41-17] at 1.

Ms. Baker did not assist Mr. Jaeckels in performing the essential functions of his job, but instead, would communicate with his employer's human resources department when he had not done so.   *See, e.g.,* Baker Dep. [45-2] at 57.   Mr. Jaeckels has not cited any authority that holds that the type of post-factum assistance she provided him constituted an accommodation within the purview of the ADA.   Because Mr. Jaeckels has not presented competent summary judgment evidence that RCOM failed to make or continue any required accommodations under the ADA for his known limitations, his failure-to-accommodate claim cannot survive summary judgment.   *See Feist*, 730 F.3d at 452.

2.   ADA discrimination claim

a.   Relevant legal authority

A plaintiff may use direct evidence, circumstantial evidence, or both to establish a disability discrimination claim.   *See Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 525 (5th Cir. 2022).   In cases such as this one, where the plaintiff relies only upon circumstantial evidence, a court must proceed under the familiar *McDonnel Douglas* burden shifting framework.   *See id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

At the first step of the analysis, a plaintiff may demonstrate a prima facie case of disability discrimination by showing that "(1) he has a disability or was

regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision because of his disability." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 341 (5th Cir. 2019).   If the plaintiff makes out a prima facie case, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 341.   If the defendant does so, the burden shifts back to the plaintiff "to produce evidence from which a jury could conclude that [the employer's] articulated reason is pretextual." *Id.* at 342 (quotation omitted).

> b.   The parties' positions

RCOM "concede[s] that Plaintiff is disabled within the meaning of the ADA and that he suffered an adverse job action when he was discharged in August 2019." Mem. [42] at 12.   However, it argues that Mr. Jaeckels was not a qualified individual with a disability after he engaged in insubordinate conduct and had other performance deficiencies. *See id.*   To the extent Mr. Jaeckels can establish a prima facie case of discrimination, RCOM contends that it has articulated a legitimate and non-discriminatory reason for his termination, and Mr. Jaeckels cannot show that the discharge decision was pretextual. *See id.* at 13-14.

Mr. Jaeckels disputes that he bears the burden of showing pretext because of the nature of his disability, but he cites no legal authority to support this position. *See* Mem. [46] at 13-14.   He essentially argues that RCOM's removal of his accommodation (human resource's contact with Mr. Baker concerning his performance issues) necessarily resulted in him being discharged because he could not correct his behavior without involving his mother. *See id.*

c.      Analysis

To the extent Mr. Jaeckels can establish a prima facie case of disability
discrimination, RCOM has come forward with a legitimate, non-discriminatory
reason for his termination.   *See Nall*, 917 F.3d at 342.   Specifically, RCOM
contends that Mr. Jaeckels "engaged in insubordinate conduct and other
performance deficiencies that led to the issuance of the performance documents and
his discharge in August 2019."   Mem. [42] at 13.   Ms. Utesch testified that after
Mr. Jaeckels received his final writeup concerning a health code violation on August
5, 2019, "that's when we decided to end his employment."   Utesch Dep. [45-5] at 37.
PDF-4 likewise stated that Mr. Jaeckels was being terminated for poor job
performance and insubordination.   Ex. [41-16] at 1.

"Terminating an employee whose performance is unsatisfactory according to
management's business judgment is legitimate and nondiscriminatory as a matter
of law."   *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 701-02 (5th Cir. 2014).   An
employee's failure to follow a direct order of a supervisor is also a legitimate
nondiscriminatory reason for taking adverse employment action.   *See Aldrup v.
Caldera*, 274 F.3d 282, 286 (5th Cir. 2001).   Here, RCOM has produced evidence
that Mr. Jaeckels was terminated both for poor job performance and
insubordination.   *See, e.g.,* Ex. [41-16] at 1.   Because RCOM has articulated
legitimate, non-discriminatory reasons for its decision, the burden shifts back to Mr.
Jaeckels to show pretext.   *See Nall*, 917 F.3d at 342.

At the pretext stage, the plaintiff "must present substantial evidence that the
employer's legitimate, nondiscriminatory reason for termination is pretextual."

*Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016)

(quotation omitted). "Pretext is established either through evidence of disparate

treatment or by showing that the employer's proffered explanation is false or

unworthy of credence." *Id.* (quotation omitted); *see also Gosby*, 30 F.4th at 527.

Mr. Jaeckels argues that RCOM's cessation of its earlier accommodation

resulted in his discharge. *See* Mem. [46] at 13-14. This argument somewhat blurs

Mr. Jaeckels' discrimination claim with his failure-to-accommodate claim, which the

Court has found should be dismissed. *See id.* However, as the Court determined

with respect to the failure-to-accommodate claim, Mr. Jaeckels did not request a

reasonable accommodation under the ADA, and based upon the record, he has not

shown that ceasing the benefit of human resources speaking with his mother

concerning his work performance constituted a failure to accommodate under the

ADA. To the extent Mr. Jaeckels' pretext argument is based on his failure-to-

accommodate theory, it fails for the same reason.

Nor has Mr. Jaeckels cited to any competent summary judgment evidence

that would tend to show any disparate treatment, or that RCOM's proffered

explanation is false or unworthy of credence. *See* Mem. [46]; *see also Delaval*, 824

F.3d at 480. Mr. Jaeckels has not identified a comparator or made any attempt to

demonstrate disparate treatment. *See* Mem. [46]; *see also Delaval*, 824 F.3d at 480.

Nor has he pointed to any evidence from which a reasonable factfinder could

conclude that RCOM's reasoning for its final employment decision was false or

unworthy of credence. *See* Mem. [46]; *see also Delaval*, 824 F.3d at 480.

When asked to describe how RCOM discriminated against Mr. Jaeckels, Ms.

Baker responded:

> Well, it just seems disparate that he -- that we went through a -- a -- a
> period of time where I was told that these things had happened to him
> and -- and were happening to him.   And up until June of this year,
> Stephanie would let me know if there was a problem.
>
> If Jeff had had a -- had a problem with one of the chefs in the kitchen,
> he didn't do what they asked him to or whatever, and she'd say, "Jeff"--
> "Jeff had a" -- "a" -- "a disagreement today with" -- "with the chef, and I
> brought him in to my office, and we talked about it.   And he decided
> that he'd go do whatever it was that they asked him to," and everything
> was fine.
>
> And then suddenly, in August, Jeff's fired, and there's three -- three
> months in a row.   Whereas the last one here was -- before this one in
> May was in -- two years before.   Then suddenly, three months in a row,
> he's got disciplinary actions that I didn't see . . . and weren't sent home.

Baker Dep. [45-2] at 55.

When Ms. Baker was asked if she believed this change in Ms. Utesch's

conduct was due to disability discrimination, she stated:

> Discrimination of some sort, yes, you know.   Whether -- whether -- I --
> I don't know that -- well, I -- I believe that Stephanie was being
> influenced to do this, not to send home the paperwork.   It's my personal
> belief, and that she did what she was told to do.   And not sending home
> the paperwork is something that she would never have not done before
> in -- in -- not only did she send it home; we'd talk about it most of the
> time in e-mail.

*Id.* at 57.   Ms. Baker theorizes that Ms. Utesch was instructed by someone else

with the casino to change her course of interaction with her to "build up a -- a case"

to terminate Mr. Jaeckels.   *Id.*   However, Ms. Baker agreed in her deposition that

she had no reason to disbelieve that Mr. Jaeckels had engaged in the conduct that

resulted in the disciplinary notices.   *See id.*   Moreover, Mr. Jaeckels acknowledges

in his Memorandum [46] that "[o]f course, other non-intellectually disabled

employees would be terminated for these issues . . . ."   Mem. [46] at 14.

No matter how sincere Mr. Jaeckels' belief may be that he suffered disability discrimination when he was terminated by RCOM, a "subjective belief of discrimination . . . cannot be the basis of judicial relief." *Delaval*, 824 F.3d at 480 (quotation omitted).   Even if Mr. Jaeckels had cited evidence that the facts underlying one or more of his disciplinary writeups and his termination were incorrect, a decisionmaker is not required to make correct decisions, only non-discriminatory ones. *See Clark v. Boyd Tunica, Inc.*, 665 F. App'x 367, 372 (5th Cir. 2016) (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)).   Because Mr. Jaeckels has not presented substantial evidence, or any evidence, that RCOM's legitimate, nondiscriminatory reason for its termination decision was a pretext for disability discrimination, summary judgment is appropriate on this claim. *See Delaval*, 824 F.3d at 480.

3.   ADA hostile work environment claim

    a.   Relevant legal authority

Mr. Jaeckels asserts that he was harassed during his employment at the Golden Nugget Casino because of his mental disabilities.   See Compl. [1-1] at 8. To establish a hostile work environment claim under the ADA, a plaintiff must show that: "(1) he belongs to a protected group, (2) was subject to unwelcome harassment (3) based on his disability, (4) which affected a term, condition, or privilege of employment, and (5) [the defendant] knew or should have known of the harassment and failed to take prompt, remedial action." *Thompson*, 2 F.4th at 470-71.   To alter the conditions of employment and create an abusive working

23

environment, harassment must be "sufficiently pervasive or severe."   *Id.* at 471
(quotation omitted).

In assessing whether harassment is sufficiently pervasive or severe, a court
must consider "the frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive utterance; and whether
it unreasonably interferes with an employee's work performance."   *Id.* (quotation
omitted).   "Simple teasing, offhand comments, and isolated incidents (unless
extremely serious) do not suffice to alter the terms and conditions of employment."
*Id.* (quotation omitted).

b.   The parties' arguments

RCOM argues that the facts do not support a hostile work environment claim
under the ADA.   *See* Mem. [42] at 16 n.8.[6]   Mr. Jaeckels responds that he suffered
"actual disability harassment" by Mr. Snuggs, Mem. [46] at 15, and that Mr. Snuggs
"did harass and call Mr. Jaeckels names such as 'Pig,'" *id.* at 19.   Mr. Jaeckels
asserts in his brief that "there was daily harassment that went on for years," which
was "pervasive."   *Id.* at 23.   Defendants point out in their Rebuttal that Mr.
Snuggs did not begin working at the Golden Nugget Casino until June 2018, and
Mr. Jaeckels was terminated in August 2019, such that any alleged harassment by
Mr. Snuggs could not have occurred "for years." Rebuttal [48] at 11-12.   Defendants
argue that Plaintiff cannot meet "the applicable standards" for disability-based

---

[6] "Defendants dispute that Plaintiff has sufficiently plead [sic] an ADA disability
harassment claim."   Mem. [42] at 16 n.8.   Even if Mr. Jaeckels has adequately pled a
hostile work environment claim, Defendant is entitled to summary judgment for the
reasons stated herein.

harassment.  *Id.* at 12.

c.  Analysis

Even if Mr. Jaeckels has presented competent evidence to support the first three elements of a hostile work environment claim, he has not done so with respect to the fourth element, because he has not presented sufficient evidence to create a genuine dispute of material fact as to whether any such harassment affected a term, condition, or privilege of his employment.  *See Thompson*, 2 F.4th at 470-71.

Mr. Jaeckels did not specifically address a hostile work environment claim in his Memorandum [46], but in discussing other claims, he states that: (1) Mr. Snuggs and "John" "harassed and intimidated" him when they "called Mr. Jaeckels 'Jethro,' banned him from the bakery, and assigned him to less desirable duties," Mem. [46] at 4; (2) "Ms. Baker started getting reports of employees, including Snuggs were calling Jeffry Jaeckels names and harassing him," *id.* at 12; (3) Mr. Jaeckels was subject to "actual disability harassment" by Mr. Snuggs, *id.* at 15; (4) Mr. Snuggs "did harass and call Mr. Jaeckels names such as 'Pig,'" *id.* at 19; (5) "[t]he conduct of Mr. Snuggs and the pastry chef harassed and made fun of Mr. Jaeckels because of his disability," *id.* at 21; (6) "[c]ertainly, the conduct described by both Mr. Jaeckels, Ms. Baker, and Ms. Utesch, such as constantly calling him names such as Jethro, retaliation against him when his mother complained, were sufficiently outrageous to be utterly intolerable in a civilized society," *id.* at 23; and (7) there was "daily harassment that went on for years," *id.*  Mr. Jaeckels does not cite any record evidence to support several of these allegations, notably those concerning the frequency of the alleged harassment and that Mr. Snuggs and "John" perpetrated

25

the harassment because of Mr. Jaeckels' disability.   *See id.* at 21, 23.

As for the alleged ban from the bakery, Ms. Baker testified that either Mr. Snuggs or "John" "said that Jeff couldn't go into the bakery when he was there because he asked too many - - he asked the same question too many times."   Baker Dep. [41-9] at 14.   Mr. Jaeckels has not pointed to any evidence regarding how often or for how long this alleged ban was in place.   *See* Mem. [46].   To the extent that such a ban could contribute to a hostile work environment, Mr. Jaeckels has not cited evidence that tends to show how the purported ban was related to his disability.   *See Thompson*, 2 F.4th at 470-71 (holding that a hostile work environment claim requires a plaintiff to show unwelcome harassment was based on his disability).

With respect to Mr. Jaeckels being assigned to less desirable duties, Ms. Baker testified that they "made him do pots and pans more often that every - - anybody else in the - - in the dishwashers," and Mr. Jaeckels "doesn't like to do pots and pans."   Baker Dep. [41-9] at 14.   However, Mr. Jaeckels testified that he "[k]ind of" liked washing the pots because it was easier than washing the dishes. Jaeckels Dep. [45-6] at 48.   Even if the pots and pans station was less desirable, Mr. Jaeckels has not presented evidence regarding how frequently he was required to perform this task compared to other dishwashers, or how placing him on this duty was in any way related to his disability.

As for alleged name-calling, the record reveals two names that Mr. Snuggs and "John" allegedly called Mr. Jaeckels, "Jethro" and "pig."   *See* Ex. [41-18] at 1; Baker Dep. [41-9] at 14; Ex. [45-6] at 14.   Even if this is true, Mr. Jaeckels has not

articulated or adequately explained how these names related to his disability or how he perceived them as relating to his disability.   *See* Mem. [46]; *see also Thompson*, 2 F.4th at 470-71 (stating that the harassment must be based on the employee's disability to be actionable).

As for the name "Jethro," Ms. Baker did explain that the men called Mr. Jaeckels "Jethro Bodine like on the Beverly Hillbillies."   Baker Dep. [41-9] at 14. While this reference could arguably be construed as a slight on Mr. Jaeckels' intellectual ability,[7] he has not pointed to any evidence to demonstrate how often this occurred.   Mr. Jaeckels claims in his Memorandum [46] in opposition that Mr. Snuggs and "John" were "*constantly* calling him names such as Jethro," but he has offered no record citations to support this assertion.   *See* Mem. [46] at 23 (emphasis added).   Indeed, during Mr. Jaeckels' deposition, he was asked if he was called names "a lot or a little," and he responded a "[l]ittle."   Jaeckels Dep. [45-6] at 14. Based upon the foregoing, Mr. Jaeckels has not shown that the comments were sufficiently frequent to support a hostile work environment claim.   *See Thompson*, 2 F.4th at 471.

Finally, to the extent Mr. Jaeckels relies upon criticism of his work to support a hostile work environment claim, this is not persuasive.   "Criticism of an employee's work performance does not satisfy the standard for a harassment claim where the record demonstrates deficiencies in the employee's performance that are

---

[7] In the television show "Beverly Hillbillies," the Clampett family "repeatedly bragged about the intelligence of adult nephew Jethro Bodine, who 'done graduated' the eighth grade--and who was portrayed as the most stupid member of the entire family.'"   Debra Lyn Bassett, Ruralism, 88 Iowa L. Rev. 273, 294 (2003).

legitimate grounds for concern or criticism . . . ."   *Thompson*, 2 F.4th at 471 (quotations omitted).   Mr. Jaeckels has not disputed the veracity of any of the complaints he received about his work.   *See, e.g.,* Jaeckels Dep. [41-4] at 38-39 (admitting with respect to the writeup concerning not cleaning the speed rack that he was asked to do so by Mr. Scruggs but did not because he "[d]on't [sic] want to"); Ex. [41-17] at 1 (EEOC investigator reporting that "Ms. Baker did not dispute the write-ups.").

Based upon the foregoing, Mr. Jaeckels has not shown that the allegedly discriminatory conduct was frequent, severe, physically threatening, or humiliating, or that it interfered with his employment.   *See Thompson*, 2 F.4th at 471.   Isolated incidents of offensive utterances and simple teasing do not alter the terms and conditions of employment.   *See id.*   Therefore, Mr. Jaeckels has not presented sufficient competent evidence to show any pervasive or severe disability harassment that altered the conditions of his employment and created an abusive working environment.   *See id.*   In sum, Mr. Jaeckels' ADA claims against RCOM are subject to dismissal.

C.   Supplemental jurisdiction over Plaintiff's state-law claims

Because all of Mr. Jaeckels' claims arising under federal law will be dismissed, only his state-law claims remain for resolution.   These include claims for breach of contract, wrongful termination, and breach of the duties of good faith and fair dealing (Count II); tortious interference with business/contractual relations (Count III); and negligent infliction of emotional distress (Count IV).   *See* Compl. [1-1] at 9-13.

28

When Defendants removed the case from state court, they invoked only this Court's federal question jurisdiction, *see* Notice of Removal [1] at 2-3, and there does not appear to be any other basis for the Court to exercise original subject-matter jurisdiction.   Specifically, the Court cannot conclude that diversity jurisdiction exists under 28 U.S.C. § 1332 because the record reflects that Mr. Jaeckels and Mr. Snuggs are both citizens of the State of Mississippi.   *See* Compl. [1-1] at 1-2.

28 U.S.C. § 1367(a) provides that

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).   A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

"District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed." *Heggemeier v. Caldwell Cty., Texas*, 826 F.3d 861, 872 (5th Cir. 2016) (quotation omitted).   Whether a district court should decline to exercise supplemental jurisdiction depends upon "common law factors of judicial economy, convenience, fairness, and comity," and the Fifth Circuit has "elucidated the general rule that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial."   *Id.* (quotation omitted).

 In this case, considerations of judicial economy are either neutral or weigh in favor of declining supplemental jurisdiction.   The Court has only been called

upon to address one prior dispositive motion, and that Motion [27] for Partial Summary Judgment led to dismissal only of Mr. Jaeckels' ADA claims against the Golden Nugget.   *See* Mot. [27]; Mem. [28].   The Court has not yet devoted any judicial resources to Mr. Jaeckels' state-law claims, which are the only ones remaining, and the Court has no substantial familiarity with them.   *See, e.g., Enochs v. Lampasas Cty.*, 641 F.3d 155, 160 (5th Cir. 2011) (finding that the judicial economy factor favored remand when "hardly any federal judicial resources . . . had been devoted to the district court's consideration of the Texas state law claims," the parties would need to duplicate work, and the district court did not have any "substantial familiarity" with the state-law claims and was not "intimately familiar" with them).

The Court's analysis of the ADA claims at summary judgment did not implicate resolution of any law or facts related to the state-law claims.   *See, e.g., United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727 (1966) (recognizing that there may be "situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong").   In the two dispositive Motions the Court has resolved, it has considered whether Golden Nugget was Mr. Jaeckels' employer for purposes of the ADA and whether RCOM failed to accommodate, discriminated against, or created a hostile work environment.   *See* Mots. [27], [41].   In considering these discrete issues, the Court was not called upon to determine whether there was a contract formed under state law and other issues central to Mr. Jaeckels' state-law claims.   Nor can the Court say that declining supplemental jurisdiction at this stage of the litigation

would result in a squandering of judicial resources.

The factors of convenience and fairness are neutral.   There is no basis to believe that declining supplemental jurisdiction over Mr. Jaeckels' remaining state-law claims would result in a venue that would be any less convenient or fair to the parties.   This Court and the state court are located in the same County, and "it [is] certainly fair to have had the purely [Mississippi] state law claims heard in [Mississippi] state court." *Enochs*, 641 F.3d at 160.   Moreover, because the case will be remanded rather than dismissed, there are no statute of limitations concerns, and "any discovery could be utilized in a state court proceeding."   *Waste Sys., Inc. v. Clean Land Air Water Corp.*, 683 F.2d 927, 931 (5th Cir. 1982).

Finally, the Court finds that considerations of comity weigh in favor of declining supplemental jurisdiction.   The comity doctrine generally "reflects a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 421 (2010) (quotation omitted). "[C]omity demands that the important interests of federalism and comity be respected by federal courts, which are courts of limited jurisdiction and not as well equipped for determinations of state law as are state courts." *Enochs*, 641 F.3d at 160 (quotation omitted).   The remaining claims in this case are distinct from the ADA claims and arise solely under state law, which a state court is certainly equipped to resolve and would have

an interest in doing so.[8]

In sum, the Court has dismissed the only claims over which it had original jurisdiction and finds that, on balance, the factors of judicial economy, convenience, fairness, and comity weigh in favor of declining supplemental jurisdiction.   *See Heggemeier*, 826 F.3d at 872.   This conclusion is consistent with the general rule that a federal court should decline to exercise supplemental jurisdiction when all federal-law claims are eliminated prior to trial.   *See id.*   Therefore, the Court will decline to exercise supplemental jurisdiction over Mr. Jaeckels' remaining state-law claims and will remand this case to state court for resolution of those claims.

### III.   CONCLUSION

To the extent the Court has not specifically addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. The Court finds that Defendants' Motion [41] for Summary Judgment should be granted in part and denied in part without prejudice.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants' Motion [41] for Summary Judgment is **GRANTED IN PART**, as to Plaintiff Jeffery D. Jaeckels' claims under the Americans with Disabilities Act, and **DENIED**

---

[8]  Although Mr. Jaeckels does concede some of his state-law claims in Count II, *see* Mem. [46] at 18, the Motion for Summary Judgment presents other peculiarly state-law issues that the Court has not considered in resolving the ADA claims.   For example, Defendants' Motion [41] calls upon the Court to resolve, among other things, whether Mr. Snuggs' alleged interference with Mr. Jaeckels' employment was privileged, and whether Mr. Jaeckels' negligent infliction of emotional distress claim is preempted by the Mississippi workers' compensation statute.   *See* Mem. [42] at 18-20; Mem. [46] at 18-23; Reply [48] at 9-12.   According to the Fifth Circuit, "technical questions of [Mississippi] law . . . are, of course, most appropriate for resolution by a [Mississippi] state court judge."   *Waste Sys., Inc.*, 683 F.2d at 931.

**WITHOUT PREJUDICE IN PART**, as to Plaintiff Jeffery D. Jaeckels' state-law claims.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Jeffery D. Jaeckels' claims under the Americans with Disabilities Act are **DISMISSED WITH PREJUDICE**, and the Court **DECLINES** to exercise supplemental jurisdiction over Plaintiff Jeffery D. Jaeckels' state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the above-captioned case is hereby **REMANDED** to the Circuit Court of Harrison County, Mississippi, Second Judicial District, and that a certified copy of this Order of remand shall be immediately mailed by the Clerk to the clerk of the state court pursuant to 28 U.S.C. § 1447(c).

**SO ORDERED AND ADJUDGED** this the 27th day of May, 2022.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

33